IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Kim Lamark Dandy,     )  Civil Action No.  8:13-cv-01089-RBH-JDA
     Plaintiff, )
         )
  vs.       )  **REPORT AND RECOMMENDATION**
         )  **OF MAGISTRATE JUDGE**
Carolyn W. Colvin,    )
Commissioner of Social Security, )
         )
     Defendant. )

    This matter is before the Court for a Report and Recommendation pursuant to 28

U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(a), D.S.C.  Plaintiff brought this

action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final

decision of Defendant Commissioner of Social Security ("the Commissioner"), denying

Plaintiff's claims for disability insurance benefits ("DIB").  For the reasons set forth below,

it is recommended that the decision of the Commissioner be remanded to the

Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative

action consistent with this recommendation.

## PROCEDURAL HISTORY

    On October 23, 2009, Plaintiff filed an application for DIB alleging an onset of

disability date of October 1, 2009. [R. 124–25.] Plaintiff's claims were denied initially on

February 18, 2010 [R. 112–15], and on reconsideration on February 17, 2011 [R. 110] by

the Social Security Administration ("the Administration").  Plaintiff requested a hearing

before an administrative law judge ("ALJ") and on December 1, 2011, ALJ Harold

Chambers conducted a de novo video hearing on Plaintiff's claims with Plaintiff appearing

in Greenville, South Carolina, and the ALJ presiding over the hearing from Chattanooga, Tennessee.  [R. 76–107.]

The ALJ issued a decision on February 24, 2012, finding Plaintiff not disabled under the Social Security Act ("the Act").  [R. 18–38.]  At Step 1,[1] the ALJ found Plaintiff met the insured status requirements of the Act through December 31, 2013, and had not engaged in substantial gainful activity since October 1, 2009, the alleged onset date. [R. 20, Findings 1 & 2.]  At Step 2, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease, degenerative joint disease, affective disorder, anxiety disorder, and coronary artery disease.  [R. 20, Finding 3.] The ALJ also determined Plaintiff had the following non-severe impairments: cellulitis, ingrown toenail, blurred vision, nausea, vertigo and nocturia in 2009, GERD, urinary hesitancy and nocturia in 2010, and migraine headaches in November 2011; history of blood clot, high blood pressure and hypercholesterolemia; and obesity.  [R. 20–21.]  At Step 3, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. 25,  Finding 4.] The ALJ specifically considered Listing 1.02, Listing 1.04, Listing 4.04, Listing 12.04, and Listing 12.06.  [R. 26–30.]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except as follows: he can lift/carry a maximum of 10 lbs frequently and lift

---

[1]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra.*

2

up to 20 pounds occasionally; stand/walk for approximately two to four hours out of eight hours in a workday; sit for six hours out of eight, but must be allowed to exercise sit/stand option as follows: cannot be off task for more than 5% of the workday and not allowed to leave the workstation except during normal breaks, can sit at anyone time up to 45 minutes and stand/walk at any time for up to 30 minutes to relieve sitting and to perform the job requirements of a particular job. He has additional limitations in that he can only occasionally push/pull with right upper extremity and frequently with the left upper extremity, occasionally operate foot controls with right lower extremity and frequently with the left, cannot climb ropes/ladders/scaffolds, can occasionally climb ramps/stairs with no more than four steps at one time, can frequently balance and occasionally stoop, cannot crouch, kneel or crawl, is limited to occasional overhead reaching with right upper extremity and frequently with left upper extremity, cannot tolerate even moderate exposure to extreme cold, vibrations, chemicals, environmental irritants (fumes, odors, dusts, gases), exposure to poorly ventilated areas and chemicals, exposure to hazards (e.g., us of moving machines and unprotected heights). He is also limited to simple, routine tasks in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, with few, if any work-place changes introduced gradually, with occasional interaction with the public.

[R. 30, Finding 5.]  Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform his past relevant work as an assembler or in the car cleaning business.  [R. 36–37, Finding 6.]  Considering Plaintiff's age, education, work experience, and RFC, however, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  [R. 37–38, Finding 10.]  Accordingly, the ALJ concluded Plaintiff had not been under a disability, as defined by the Act, at any time from October 1, 2009, through the date of the decision.  [R. 38, Finding 11.]

Plaintiff requested Appeals Council review of the ALJ's decision, but the Council declined review.  [R. 1–5.]  Plaintiff filed this action for judicial review on April 23, 2013. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and claims the ALJ erred by

(1)     improperly rejecting multiple opinion letters from Plaintiff's treating physician, Dr. Kooistra, when her opinions were entitled to controlling weight [Doc. 10 at 4–9];

(2)     incorrectly determining Plaintiff's RFC assessment [*id.* at 10];

(3)     failing to give appropriate consideration to the vocational consequences of pain on Plaintiff's work ability [*id.* at 10–11]; and,

(4)     incorrectly rejecting Plaintiff's credibility concerning his pain [*id.* at 12–13].

The Commissioner, on the other hand, contends the ALJ's decision is supported by substantial evidence because the ALJ

(1)     properly assigned "little weight" to Dr. Kooistra's assessment of Plaintiff's disabling physical limitations [Doc. 11 at 18–23];

(2)     properly determined Plaintiff's RFC assessment [*id.* at 23–26];

(3)     properly evaluated Plaintiff's credibility and his complaints of pain [*id.* at 26–31].

Accordingly, the Commissioner requests that the Court affirm the ALJ's decision.  [*Id.* at 31.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the

4

evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963))("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

5

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to

6

allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the

7

reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[2]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

---

[2]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).    The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. § 404.1520.  Through the fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).  If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience.  *Grant*, 699 F.2d at 191.  If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary.  20 C.F.R. § 404.1520(a); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 404.1572(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 404.1572(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* § 404.1521. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them"). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."). If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B).

10

**C.** *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 404.1509, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d).

**D.** *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant." *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995). At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[3] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work. 20 C.F.R. § 404.1560(b).

**E.** *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); 20 C.F.R. § 404.1520(f)–(g). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily

---

[3]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a).

11

from an exertional impairment, without significant nonexertional factors.[4] 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *see also Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. § 404.1569a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.    Developing the Record

---

[4]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. § 404.1569a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. § 404.1569a(c)(1).

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ is required to inquire fully into each relevant issue. *Snyder*, 307 F.2d at 520. The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980). In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

## III.   Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 404.1527(c). Similarly, where a treating physician has merely made

conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 404.1527(c)(2). An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. § 404.1527(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 404.1517; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative

examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 404.1517. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.     Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518

15

(4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ

must consider all of a claimant's statements about his symptoms, including pain, and

determine the extent to which the symptoms can reasonably be accepted as consistent with

the objective medical evidence.  20 C.F.R. § 404.1528.  Indeed, the Fourth Circuit has

rejected a rule which would require the claimant to demonstrate objective evidence of the

pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the

Commissioner to promulgate and distribute to all administrative law judges within the circuit

a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v.

Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the

following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth
> Circuit (North Carolina, South Carolina, Maryland, Virginia and
> West Virginia), Social Security Ruling (SSR) 88-13, Titles II
> and XVI: Evaluation of Pain and Other Symptoms:
> 
> ...
> 
> **FOURTH CIRCUIT STANDARD:** Once an underlying
> physical or [m]ental impairment that could reasonably be
> expected to cause pain is shown by medically acceptable
> objective evidence, such as clinical or laboratory diagnostic
> techniques, the adjudicator must evaluate the disabling effects
> of a disability claimant's pain, even though its intensity or
> severity is shown only by subjective evidence.  If an underlying
> impairment capable of causing pain is shown, subjective
> evidence of the pain, its intensity or degree can, by itself,
> support a finding of disability.  Objective medical evidence of
> pain, its intensity or degree (i.e., manifestations of the
> functional effects of pain such as deteriorating nerve or muscle
> tissue, muscle spasm, or sensory or motor disruption), if
> available, should be obtained and considered.  Because pain
> is not readily susceptible of objective proof, however, the
> absence of objective medical evidence of the intensity,
> severity, degree or functional effect of pain is not
> determinative.

16

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. § 404.1529(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria. *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor. But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

## Treating Physician Opinions

Plaintiff takes issue with the ALJ's weighing of the opinion evidence provided by Plaintiff's treating physician Dr. Kooistra by contending that these opinions were improperly rejected when they were entitled to "controlling weight." [Doc. 10 at 4.] The Commissioner argues the ALJ properly weighed the opinions of Dr. Kooistra. [*See* Doc. 11, *generally*.] The Court agrees with Plaintiff that the ALJ improperly evaluated Dr. Kooistra's opinions.

The responsibility for weighing evidence falls on the Commissioner or the ALJ, not the reviewing court. *See Craig*, 76 F.3d at 589; *Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 520. The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Courts typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (quoting *Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. § 404.1527(c).

The opinion of a treating physician is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Additionally, Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

18

> [A] finding that a treating source medical opinion is not well
> supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the
> opinion should be rejected. Treating source medical opinions
> are still entitled to deference and must be weighed using all of
> the factors provided in 20 C.F.R. 404.1527 and 416.927. In
> many cases, a treating source's opinion will be entitled to the
> greatest weight and should be adopted, even if it does not
> meet the test for controlling weight.

1996 WL 374188, at *4 (July 2, 1996). However, not every opinion offered by a treating

source is entitled to deference:

> Medical sources often offer opinions about whether an
> individual who has applied for title II or title XVI disability
> benefits is "disabled" or "unable to work," or make similar
> statements of opinions. In addition, they sometimes offer
> opinions in other work-related terms; for example, about an
> individual's ability to do past relevant work or any other type of
> work. Because these are administrative findings that may
> determine whether an individual is disabled, they are reserved
> to the Commissioner. Such opinions on these issues must not
> be disregarded. However, even when offered by a treating
> source, they can never be entitled to controlling weight or given
> special significance.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1527(e),

416.927(e) (stating an ALJ does not have to "give any special significance to the source

of an opinion on issues reserved to the Commissioner," such as an opinion that the

claimant is disabled, the claimant's impairment or impairments meets or equals a listing,

or the claimant has a certain residual functional capacity).

### *Brief Medical History*

Plaintiff was involved in a car accident on February 3, 2009, when a car in front of

him stopped suddenly and he was hit from behind. [R. 216.] On February 5, 2009, Plaintiff

saw Dr. Monica L. Cook ("Dr. Cook") of Cook Family Chiropractic for consultation, examination, and treatment of low back pain with radiation across the hips which he described as dull and achy. [*Id.*] Plaintiff indicated that rest, over-the-counter medicine, and inactivity alleviated the pain. [*Id.*] On examination, Dr. Cook noted Plaintiff was erect and ambulation was normal; active and passive motion was restrictive and painful in all planes of motion in the lumbar spine; weakness was present in the hamstring, quadricepts, and gluteal and psoas muscle bilaterally measuring a 4/5; and all other lower extremity strength tests were strong and equal. [*Id.*] Plaintiff was treated from February 2009 through April 2009 using manipulation at 1-2 times per week and with a home stretching program. [R. 217–18.]

On April 24, 2009, Plaintiff presented to Dr. David Mitchell ("Dr. Mitchell") of Orthopaedic Associates, P.A., complaining of lumbar pain. [R. 251.] On exam, Dr. Mitchell noted Plaintiff had an antalgic gait, complained bitterly of muscle spasms, and had a decreased range of motion of his lumbar spine secondary to the spasms. [*Id.*] Dr. Mitchell noted Plaintiff's deep tendon reflexes were intact; muscle strength was good to the right and left lower extremities; that, subjectively, Plaintiff has some radicular symptoms on the right side but none now; and that his range of motion in his hips, knees, and ankles was normal. [*Id.*] Dr. Mitchell started Plaintiff in a physical therapy program and obtained an MRI. [*Id.*] On April 29, 2009, Plaintiff returned to Dr. Mitchell on follow up after an MRI of the lumbar spine conducted at by Dr. William Joyce at Upstate Carolina Radiology. [R. 246, 248.] Dr. Mitchell noted the MRI results showed nothing significant, but did show epidural lipomatosis at L3-4. [*Id.*] Dr. Mitchell's notes indicate that Plaintiff continued to have intermittent radiculopathy going down in his right lower extremity approximately to his

20

knee and that his pain was exacerbated with walking and prolonged sitting.  [*Id.*]  On May
13, 2009, Plaintiff returned to Dr. Mitchell on follow up with complaints of back pain.  [R.
243.]  Plaintiff complained of continued tenderness to palpation mild to moderate of what
appears to be L4-L5 and has a tendency to go bilaterally into his buttocks as well as travel
upward into his lumbar spine. [R. 244.]  Dr. Mitchell referred Plaintiff to Spartanburg Neuro
to further reassess him for lipomatosis.  [*Id.*]

On May 26, 2009, Plaintiff presented to Dr. Cavert K. McCorkle ("Dr. McCorkle") of
Spartanburg Neurosurgical Institute, P.A., ("SNI"), with complaints of low back and lower
extremity pain.  [R. 220.]  Plaintiff complained that he has experienced persistent and
sometimes quite severe pain since his February 2009 car accident and that chiropractic
adjustments, massage therapy, physical therapy, muscle relaxants, and anti-inflammatory
medication had been of little to no benefit.  [*Id.*]  Plaintiff was sent by Dr. David Mitchell
("Dr. Mitchell") of Orthopedic Associates, P.A., for an MRI and was told that no
abnormalities were noted but that there was some prominence in the fatty tissue in the
spinal cord in the lumbar spine prompting referral to Dr. McCorkle. [*Id.*]  On physical exam,
Dr. McCorkle noted that Plaintiff was able to stand independently and assume a normal
station; his gait was deliberate but not overtly antalgic; and that he could perform heel and
toe walk but reported increased low back pain. [R. 221.]  Dr. McCorkle noted that Plaintiff
exhibited some degree of guarding and restriction in all movements of the low back;
however, interestingly, straight leg raises caused minimal pain.  [*Id.*]  Review of Plaintiff's
lumbar MRI revealed normal vertebral body alignment and lordotic curve; very mild early
degenerative changes at L1-2 and L2-3; and no significant disc protrusion or evidence of
neural compression at any level.  [R. 222.]  Dr. McCorkle diagnosed lumbago and

21

intermittent lower extremity radicular pain following motor vehicle accident and very minor lumbar disc degeneration and mildly prominent lipomatosis, non-surgical. [*Id.*] Dr. McCorkle found no evidence of any significant structural abnormalities in Plaintiff's lumbar spine that would explain the level of discomfort or warrant surgical intervention and recommended he continue with physical therapy with Dr. Mitchell and continue with conservative treatment with the feeling that his present discomfort is primarily soft tissue or inflammatory in nature and should improve with time. [*Id.*]

On May 27, 2009, Plaintiff returned to Dr. Mitchell on follow up and, given the unchanged neurologic assessment, he ordered a nerve conduction EMG study on both lower extremities as well as a bone scan. [R. 242.] On that same day, Plaintiff was seen by Dr. Carol A. Kooistra ("Dr. Kooistra") of Carolina Neurology after developing bilateral low back pain which, when more severe, will travel down his legs with some associated tingling. [R. 308.] Dr. Kooistra's interpretation was that there was degenerative disc disease at L3-4 without foraminal or spinal stenosis; and that Plaintiff had lipomatosis of the epidural space which had been cleared by neurosurgery as a benign finding. [*Id.*] On neurological exam, Plaintiff demonstrated intact higher cortical functions, cranial nerves, motor, sensory, reflex, cerebellar and gait exams. [*Id.*] Dr. Kooistra diagnosed musculoskeletal pain syndrome and degenerative disc disease, noted that they would pursue nerve conduction studies as requested, and noted that pain management would be considered in the future. [*Id.*]

On June 10, 2009, Plaintiff returned to Dr. Kooistra. [R. 300.] Dr. Kooistra's notes indicate that Plaintiff's nerve conduction studies suggested a right L5 root change with EMG changes as well, and that Plaintiff continued to have low back pain traveling into his buttocks and legs. [*Id.*] Plaintiff saw Dr. Mitchell again on June 16, 2009, on follow up. [R.

22

237.]  Treatment notes indicate a nerve conduction study was done showing right L5 radiculopathy and that Plaintiff has not tolerated therapy at all.  [*Id.*]  Plaintiff continued to work, however, as the owner of a car wash business.  [*Id.*]  An MRI was also reviewed on this visit with Dr. Mitchell noting that he only saw the problem of a slightly degenerative disc at L3-4 and that Plaintiff did have lipomatosis.  [R. 238.]  Dr. Mitchell opined that his lipomatosis may be causing Plaintiff to have some sort of back discomfort and referred him to the spine surgeons in Charlotte to see if they could help.  [R. 239.]  Dr. Mitchell also ordered Plaintiff a Carolina LSO brace.  [*Id.*]

On June 29, 2009, Plaintiff presented to CMA Diagnostics for a whole body bone imaging exam on referral from Dr. Mitchell.  [R. 240.]  Dr. Lawrence Warren ("Dr. Warren") interpreted the images and found increased activity in the right shoulder, probably degenerative; no focal abnormality in the spine, pelvis, or hips; increased activity about the right lateral knee which are degenerative or post traumatic; and increased activities projecting over the left lower chest.  [*Id.*]  Dr. Warren found no significant abnormality to correlate with Plaintiff's lateral hip and leg pain otherwise.  [*Id.*]

On August 14, 2009, Plaintiff presented to Spartanburg Regional Medical Center ("SRMC") with complaints of back and lower extremity radiculopathy.  [R. 292.]  A lumbar myelogram was ordered by Dr. Kooistra; mild degenerative disc disease was noted at the L3/4 level.  [*Id.*]  A CT scan of the lumbar spine was also obtained post myelogram which showed mild degenerative joint disease at the facet joints at L1/2; mild broad-based disc bulge with ligamentum flavum hypertrophy and facet hypertrophy at L2/3, L3/4 and L4/5; and mild broad-based disc bulge without evidence of significant spinal stenosis at L5/S1.

[R. 293.]  Plaintiff was seen again on August 28, 2009, with low back pain; his neurological exam remained normal.  [*Id.*]

On September 24, 2009, Plaintiff was admitted to SRMC with complaints of chest pain.  [R. 253.]  Plaintiff underwent cardiac catheterization and was found to have significant stenosis in the mid-right coronary artery requiring stenting with two drug eluding stents.  [R. 254.]  Upon release from the hospital, Plaintiff was to continue treatment with aspirin and Plavix and indicated that Plaintiff needed to be aggressive with his cholesterol management.  [R. 256.]

Plaintiff began seeing Dr. Bert Blackwell ("Dr. Blackwell") of Pain Management Associates ("PMA") on October 13, 2009, with complaints of mid and low back pain that radiates down bilateral lower extremities posteriorly and anteriorly into feet.  [R. 336.]  Dr. Blackwell assessed lumbar radiculopathy, lumbar disc displacement, insomnia, and arthritis/spondylosis-lumbar.  [R. 337.]  Dr. Blackwell also started Plaintiff on Ultram and Zanaflex.  [*Id.*]

On October 26, 2009, Plaintiff saw Dr. Alejandro N. Lopez ("Dr. Lopez") of Cardiology Consultants, P.A., on follow up after suffering a myocardial infarction and undergoing stenting of the right coronary artery with two drug-eluting stents.  [R. 315.] Plaintiff complained of chest pressure with shortness of breath and a sharp chest pain that lasts about 10–15 seconds, as well as bilateral leg pain, but had not experienced any palpitations or periods of dizziness.  [*Id.*]  An EKG revealed normal sinus rhythm with T wave inversion in lead 3.  [R. 316.]  Plaintiff returned to Dr. Kooistra on October 29, 2009, on follow-up with complaints of musculoskeletal low back pain.  [R. 296.]  Dr. Kooistra noted that a trial of prednisone was ineffective and referred him to Dr. Blackwell, but before

24

Plaintiff could see Dr. Blackwell, he had a myocardial infarction and required a heart stent by Dr. Lopez. [*Id.*]

On November 9, 2009, Plaintiff returned to Dr. Blackwell with continued complaints of pain which is described as constant.  [R. 339.]  Dr. Blackwell noted that Plaintiff needs "TF ESI" but that they are unable to perform ESI as Plaintiff is unable to stop Plavix per his cardiologist.  [R. 340.]  Dr. Blackwell noted that he would consider a CT myelogram since an MRI is not prohibited.  [*Id.*]  Dr. Blackwell discontinued Plaintiff's Lortab, but started him on Lyrica and Oxycodone-acetaminophen.  [R. 340–41.]

On November 11, 2009, Plaintiff returned to Dr. Lopez on follow-up with continued symptoms of chest pain which were pleuritic in nature and worsening when he takes a deep breath or lies supine, as well as continued back pain.  [R. 319.]  Plaintiff underwent an EKG by Dr. Lopez which showed normal left ventricular size and function with mild concentric left ventricular hypertrophy; no pericardial effusion; and no mitral valve prolapse. [R. 317.] On November 12, 2009, Plaintiff returned to SRMC for chest x-rays; no acute abnormalities were noted.  [R. 287.]

On December 8, 2009, Plaintiff returned to Dr. Blackwell on follow up noting that his medications were helping him relax but were causing side effects.  [R. 342.]  Dr. Blackwell planned an ESI in three months with Lovenox after Plaintiff has been off Plavix for 5 days, and required that Plaintiff see him prior to injections.  [R. 343.]  Dr. Blackwell also added MS Contin to Plaintiff's prescriptions.  [*Id.*]  On February 5, 2010, Plaintiff saw Dr. Blackwell on follow up indicating that his pain level was an 8/10 with pain radiating down to the LE. [R. 344.]

On January 28, 2010, Plaintiff saw Dr. Kooistra on follow-up, after a three-month absence, for difficulties with chronic low back pain.  [R. 379.]  Notes indicate that Plaintiff was seeing Dr. Blackwell for pain management but that Dr. Blackwell has been limited in performing diagnostic and therapeutic interventions because of Plaintiff's need for Plavix secondary to this cardiac stenting.  [*Id.*]  Dr. Kooistra indicated that Plaintiff demonstrated normal tone, bulk and strength with normal fine motor movements on exam.  [*Id.*]  Dr. Kooistra also notes that Plaintiff should return to pain management for analgesic prescription and await ESI or discogram trial.  [R. 380.]

On February 12, 2010, Xanthia Harkness, Ph.D. ("Dr. Harkness") completed a Psychiatric Review Technique with respect to Plaintiff's anxiety-related impairments and found them not severe.  [R. 349–50.]  Dr. Harkness found Plaintiff had mild restrictions in activities of daily living, no difficulties in social function, concentration, persistence or pace, and no episodes of decompensation.  [R. 359.]  Dr. Harkness noted that Plaintiff "gets up does basic household chores, run[s] errands, and comes back home and rest[s].  Clmt can pay attention for a long time, good memory, gets along w[ith] others and can handle change, no problems w[ith] these issues."  [R. 361.]  Thus, Dr. Harkness found Plaintiff's anxiety posed minimal restriction on his ability to perform work functions.  [*Id.*]

A Physical Residual Functional Capacity Assessment ("PRFC") performed by Dr. Seham El-Ibiary ("Dr. El-Ibiary") on February 12, 2010, found Plaintiff capable of occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds; standing/walking and sitting about 6 hours in an 8-hour day, and pushing/pulling in unlimited manner except as shown for lifting or carrying.  [R. 364.]  Dr. El-Ibiary appears to indicate Plaintiff can perform light work.  [R. 365 ("rate to light").]  With respect to postural

26

limitations, Dr. El-Ibiary limited Plaintiff to frequent climbing ramps/stairs, kneeling, crouching and crawling, but occasional climbing ladders/ropes/scaffolds, balancing or stooping.  [*Id.*]  With respect to manipulative limitations, Dr. El-Ibairy noted Plaintiff's reaching in all directions was limited due to his right shoulder, but that he was not limited in handling, fingering or feeling. [R. 366.]  Dr. El-Ibiary assessed no communicative or environmental limitations with the exception of Plaintiff avoiding hazards.  [R. 367.]

On March 3, 2010, Plaintiff saw Dr. Lopez on referral from Dr. Stephen Bailes on follow up with continued left-sided chest pain, a significant amount of shortness of breath when he's out walking, and back pain. [R. 398.]  Dr. Lopez ordered a chest x-ray, a stress Cardiolite study and increased his lisinopril dosage and added Coreg.  [*Id.*]  Dr. Lopez indicated it was his suspicion that "one of his symptoms above may be related to heightened anxiety." [*Id.*]  On March 11, 2010, Plaintiff presented to Dr. Kristen Nawabi of Cardiology Consultants for myocardial perfusion imaging.  [R. 397.]  Left ventricular function appeared abnormal with an ejection fraction of 47% but without wall motion abnormalities and the images revealed no ischemia.  [*Id.*]

On April 2, 2010, Plaintiff presented to SRMC with recurrent symptoms of exertional and nonexertional chest pain.  [R. 391.]  Due to continued symptoms, Plaintiff was referred for diagnostic cardiac catherization which showed normal left coronary system, right coronary artery stent with otherwise normal appearing right coronary artery, and normal left ventricular function.  [R. 392.]  On April 23, 2010, Plaintiff presented to Dr. Mossburg at Gastroenterology Associates complaining of left anterior and left lateral chest pain which has been present since his myocardial infarction approximately a year earlier.  [R. 371, 393.]  Plaintiff explained that he experiences increased pain and shortness of breath when

27

he lays on his left side. [*Id.*] Dr. Mossburg recommended Plaintiff for an EGD to evaluate his chest pain. [*Id.*]

On May 10, 2010, Dr. Kooistra completed a form for CUNA Mutual Group indicating that Plaintiff was totally disabled from performing his previous occupation or any other occupation; could stand for 1 hour/day; sit for 2 hours/day; and drive and walk from 0–1 hour/day. [R. 374.] Dr. Kooistra noted Plaintiff could use his hands for repetitive movement, could reach above shoulder level, had no limitations from a cardiac functional capacity, and that his condition was not expected to change. [R. 374–75.] Plaintiff returned to Dr. Kooistra on April 28, 2010, for his chronic low back pain complaining that epidural injections through pain management have been ineffective. [R. 377.] Treatment notes indicate Plaintiff was undergoing manometry of the esophagus and had begun medication for sleep and depression/anxiety (Restoril and Paxil). [*Id.*] On physical exam, Dr. Kooistra noted that Plaintiff demonstrated normal tone, bulk and strength with normal fine motor movements and foot tapping; gait testing was normal; and straight leg raising was negative. [*Id.*]

On May 11, 2010, Plaintiff presented to Dr. Lesle Long ("Dr. Long") of Pain Management Associates on follow up from a March 16, 2010, visit. [R. 405.] Treatment notes indicate Plaintiff stated that medications were helping but that he was taking more than prescribed because of increased pain; that he used Contin occasionally as a back up but too much made him nauseous; and that he was having trouble sleeping. [*Id.*] On August 10, 2010, Plaintiff saw Dr. Long on follow up with complaints of back pain and left-side chest pain when laying on his left side. [R. 408.] Dr. Long prescribed Zipsor, Percocet, and Skelaxin and spoke with Plaintiff about back injections. [R. 410.] Plaintiff

28

returned to Dr. Long on September 10, 2010, with continued complaints of chest pain and back pain running down his left leg causing numbness and some tingling. [R. 411.] Plaintiff was advised to follow up with his PCP and cardiologist regarding his chest pains and chronic pain issues. [R. 413.] On September 22, 2010, Plaintiff was seen by Dr. Lopez who noted that he concurred that Plaintiff has a component of anxiety, but that he was doing well from a cardiac perspective. [R. 386.]

On October 26, 2010, Plaintiff returned to Dr. Blackwell for an epidural steroid injection ("ESI"). [R. 417.] Plaintiff returned to Dr. Blackwell on November 9, 2010, on follow up from ESI reporting no relief at all and continued back pack pain radiating up to his neck and down his legs. [R. 419.] Plaintiff noted that anxiety was a significant part of his pain and Dr. Blackwell was very concerned that the pain was spreading. [ R. 421.]

On January 6, 2011, Plaintiff reported to Dr. Paul Behr ("Dr. Behr") of Orthopaedic Associates for evaluation for his cervical spine and lumbar spine pain complaints which Dr. Behr determined were likely related to myofascial pain with a component of facet arthropathy on the right greater than left at L3-4, L4-5, and L5-S1. [R. 431.] Dr. Behr recommended a L2-5 medial branch block and either a brace or possible discogram depending on the results of the block. [*Id.*] On January 6, 2011, Plaintiff reported to Dr. Behr on follow up after a medial branch block at right L2-5 reporting immediate relief for about three to six hours but a return of pain afterwards. [R. 426.]

A Psychiatric Review Technique was conducted by Craig Horn, Ph.D. ("Dr. Horn') on February 4, 2011, finding Plaintiff's anxiety disorder non-severe. [R. 438–39.] Dr. Horn indicated Plaintiff exhibited no restrictions in activities of daily living, no difficulties in maintaining social function, no episode of decompensation and mild difficulties in

29

maintaining concentration, persistence or pace.  [R. 448.]  On February 17, 2011, Dr. Dale Van Slooten (Dr. Van Slooten) completed a Physical Residual Functional Capacity Assessment ("PRFC") and found Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand/walk and sit 6 hours in an 8 hour day; and push in unlimited fashion except as shown for lift/carry.  [R. 453.]  With respect to postural limitations, Dr. Van Slooten noted Plaintiff was limited to occasional climbing ladder/rope/scaffolds, but could frequently climb ramps/stairs, balance, stoop, kneel, crouch and crawl.  [R. 454.]  With respect to Plaintiff's manipulative limitations, Dr. Van Slooten found Plaintiff was limited in reaching in all directions, including overhead, but not limited in handling, fingering, or feeling.  [R. 455.]  Dr. Van Slooten noted no visual or communicative limitations and only limited Plaintiff environmentally from hazards (machinery, heights, etc.) due to his regiment of pain medications.  [R. 445–46.]  Dr. Van Slooten opined that objective medical evidence did not preclude Plaintiff from a light range of work activity.  [R. 457.]

Additionally, on March 4, 2011, Plaintiff underwent a L3-4, L4-5, and L5-S1 discogram by Dr. Behr.  [R. 476.]  The discogram was deemed successful and Plaintiff reported minimal to no concordance with his usual pain.  [R. 478.]  On March 18, 2011, Plaintiff returned to Dr. Behr on follow-up and, unfortunately, his discogram was undiagnostic.  [R. 482.]  Dr. Behr also noted that Plaintiff failed medial branch block, radio frequency ablation and previous epidural steroid injections with Dr. Blackwell.  [*Id.*]  Additionally, Dr. Behr noted that Plaintiff was taking more of his medications than prescribed and was calling requesting early refills.  [*Id.*]  Also, on March 18, 2011, Plaintiff presented to Dr. Steven P. Hess ("Dr. Hess") of Westgate Family Physicians complaining

of low back pain. [R. 493.]  Dr. Hess noted lumbar paraspinal muscle tenderness and decreased extension of the spine.  [R. 494.]  Dr. Hess prescribed Cymbalta, Oxycodone, and Duragesic.  [R. 497.]

On March 25, 2011, Plaintiff returned to Dr. Kooistra with complaints of low back pain.  [R. 460.]  Treatment notes indicate Plaintiff was dismissed by a pain management doctor for lack of additional therapeutic options and for medication overuse and that he was now being managed by Dr. Bailes.  [*Id.*]  On examination, Plaintiff exhibited normal tone, bulk and strength with normal fine motor movements and foot tapping; gait testing was normal; and straight leg raising was negative.  [*Id.*]  Dr. Kooistra noted that Plaintiff was to receive continued care from FMD as he was at MMI and appeared permanently and totally disabled.  [*Id.*]

On June 10, 2011, Plaintiff presented to Dr. Marco A. Rodriguez ("Dr. Rodriguez") of Orthopedic Specialties of Spartanburg with complaints of low back pain, bilateral leg pain, neck and shoulder pain.  [R. 512.]  Dr. Rodriguez noted Plaintiff ambulates well, strength is 5/5 bilaterally; no pain with straight leg raises; pain with internal rotation of the hip on the  right in the right hip; and worsening pain with extension and extension rotation. [R. 513.]  Dr. Rodriguez noted Plaintiff has exhausted all conservative options and recommended a spinal cord stimulator ("SCS").  [*Id.*]

Plaintiff was seen for evaluation on July 18, 2011, by Dr. C. David Tollison ("Dr. Tollison") at the Carolinas Center for Advanced Management of Pain.  [R. 465.]  Dr. Tollison noted that Plaintiff was under the primary care of Dr. Bailes, the neurological care of Dr. Kooistra, the cardiology care of Dr. Lopez, the orthopedic care of Dr. Rodriguez, and the pain management care of Dr. Blackwell.  [R. 466.]  Dr. Tollison also noted that Plaintiff's

medications included Cymbalta, Nitroglycerine, Lisinopril, Plavix, Tramadol, and Carvediliol. [*Id.*]  Dr. Tollison diagnosed Plaintiff with Anxiety Disorder with psychological factors affecting his physical condition on Axis I; lower back and bilateral lower extremity pain, coronary artery disease s/p myocardial infarction and cardiac stenting on Axis III; occupational, health and social on Axis IV; and a GAF of 50 on Axis V.  [R. 468.]  Dr. Tollison concluded that, upon his review of the medical records as well as MMPI testing, Plaintiff's overall symptomatology is consistent with a diagnosis previously called "cardiac neurosis," which occurs when an individual suffers a life-threatening event and triggers multiple reactive psychological symptoms that, in turn, serve to periodically exacerbate physical symptoms.  [*Id.*]  Dr. Tollison further opined that Plaintiff did not exhibit the concentration, persistence, or pace typically required in a work setting and that it is unlikely he could complete a series of workdays without interruption from psychological symptoms. [*Id.*]  Dr. Tollison further opined that work pressures, stresses, and demand situations are expected to result in deterioration both in physical and psychological functioning; Plaintiff's condition is chronic, expected to last over the next twelve months or more; and any award of funds could be managed by Plaintiff.  [*Id.*]

On July 26, 2011, Plaintiff presented to MCC, Inc., for psychiatric evaluation by Dr. Lesle D. Long ("Dr. Long") with depressive symptoms with excessive sleep, lack of energy, change in appetite, suicidal ideation, mania with feelings of irritability, panic attacks with nausea, chest pain, panic attacks with fear of dying, anxiety with excess worry, anxiety with restlessness/feeling of being on edge, and anxiety with fatigue.  [R. 523.]  Dr. Long found Plaintiff to be a good candidate for SCS.  [R. 525.]  On August 8, 2011, Plaintiff underwent a SCS trial by Dr. Blackwell.  [R. 526.]  Treatment notes from Dr. Kooistra on August 10,

2011, indicate the spinal stimulator reduced Plaintiff's pain by half. [R. 561.] On September 12, 2011, Plaintiff underwent surgery to have the SCS implanted by Dr. Michael Bucci ("Dr. Bucci") of St. Francis. [R. 531.]

On November 16, 2011, Dr. Kooistra completed an Attending Physician Statement indicating that she has treated Plaintiff 3–4 times a year since May 27, 2009, for low back pain which is constant, severe, and worse with activity. [R. 578.] Dr. Kooistra noted that objective signs include reduced range of motion, tenderness, and muscle spasm. [*Id.*] Dr. Kooistra opined that Plaintiff's functional limitations in a competitive work environment included sitting 1 hour per day; standing 30 minutes before needing to sit or walk around; sitting about 4 hours and stand/walk less than 2 hours in an 8 hour day; rarely lift 10 pounds or less and never lift more than 20 pounds; never crouch or climb ladders and rarely twist, stoop(bend), or climb stairs. [R. 578–79.] Dr. Kooistra also opined Plaintiff had significant limitations in repetitive reaching and that, considering the combination of his problems, he was incapable of full-time work even at a sedentary level. [R. 579–80.] Dr. Kooistra indicated Plaintiff's restrictions have persisted since October 2009, the date Plaintiff became disabled. [R. 580.]

Dr. Kooistra completed a subsequent Attending Physician Statement on December 22, 2011, clarifying her previous findings as requested by the ALJ. [R. 597.] Dr. Kooistra opined Plaintiff could sit 1 hour at a time before needing to get up; could stand 30 minutes at one time before needing to sit or walk around; could walk 45 minutes at one time before needing to sit down; could sit for about 2 hours in an 8 hour work day and stand/walk for less than 2 hours in an 8-hour work day. [R. 597.] Dr. Kooistra also clarified that her May 2010 and April 2011 opinions were based on Plaintiff's medical history and diagnostic exam

33

studies. [*Id.*]  Dr. Kooistra also clarified that her opinion was not based on cardiac functional capacity.  [R. 598.]

### ALJ's Treatment of Dr. Kooistra's Medical Opinions

In evaluating Dr. Kooistra's opinions of record, the ALJ explained as follows:

> As for the opinion evidence, I have considered Dr. Kooistra's multiple statements that claimant is unable to do his usual work, unable to do other work, and is permanently and totally disabled. Under SSR 96-5p and the regulations, these are administrative findings and the final responsibility for deciding such administrative findings is reserved to the Commissioner. Nevertheless, adjudicators must always carefully consider medical source opinions about issues reserved to the Commissioner.  Although such opinions are never entitled to controlling weight or special significance, the adjudicator may not ignore them and must evaluate all the evidence in the record that may have a bearing on the determination of disability to determine the extent to which the opinion is supported by the record.

> Dr. Kooistra's statements are opinions about issues reserved to the Commissioner and are administrative findings; thus, they are not entitled to controlling weight or special significance. She did not provide a reasonable basis for the opinions. I offered her the opportunity to clarify her opinions and she did not do so in her December 2011 statement. The findings made during her course of treatment do not support her conclusions. I note that other than EMG findings, her clinical findings are almost negative, including findings of negative straight leg raise and normal gait, tone, bulk, strength and reflexes on all exams. I also note claimant's testimony that Dr. Kooistra is not treating him, but rather, is monitoring him. Her opinions are not consistent with the remainder of the evidence, including evidence from other treatment sources. Therefore, I assign little weight to the opinions.

> . . .

> Dr. Kooistra submitted statements concerning claimant's RFC in May 2010, and December 2011, but I do not assign controlling weight to her opinions. She is a "treating source" and the opinions are medical opinions about the nature and

severity of the claimant's impairments; however, the statements are not well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. Therefore, I assign little weight to her RFC statements.

An adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

There are obvious inconsistencies between her opinions and other substantial evidence, including the claimant's own statements about his activities, Dr. Bailes' advice to the claimant not to seek disability and Dr. Lopez's findings of normal EKG and echocardiogram, that chest pain was not ischemic in nature, and that he was doing well and stable from a cardiac standpoint.

Claimant's statements amount to substantial, nonmedical evidence showing that his activities are greater than those provided in Dr. Kooistra's opinions.

[R. 34–35.]

### *Discussion*

While the ALJ may properly discount Dr. Kooistra's finding of disability, as this finding is reserved to the Commissioner, the ALJ is obligated to rationally articulate his weighing of the treating physician's opinion. *See Steel v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). Social Security regulations require the ALJ to consider all of the medical opinions in a claimant's case record, as well as the rest of the relevant evidence. 20 C.F.R. § 404.1527(c)(2012). These regulations also provide that "a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." SSR 96–2P (S.S.A. July 2, 1996). By apparently rejecting Dr. Kooistra's opinions in their entirety, the ALJ parted ways with agency regulations.

As summarized above, Dr. Kooistra treated Plaintiff 3-4 times a year beginning on May 27, 2009, for low back pain which was "constant, severe and worse with activity." [R. 578.] Dr. Kooistra noted that objective signs of Plaintiff's pain included reduced range of motion, tenderness and muscle spasm. [*Id.*] Based on these objective signs, as well as her treatment of Plaintiff's pain, Dr. Kooistra provided her opinion and statements regarding Plaintiff's functional limitations in a competitive environment. [*See* R. 578–79.] The ALJ gave Dr. Kooistra's opinions little weight finding them inconsistent with "the remainder of the evidence, including evidence from other treating sources." [R. 34–35.] The ALJ also concluded that Dr. Kooistra's statements "were not well supported by medically acceptable clinical and laboratory diagnostic techniques." [R. 35.]

In his analysis, the ALJ concluded that Dr. Kooistra's opinion regarding Plaintiff's "disability was substantiated only by subjective findings" [R. 23], and he discounted Dr. Kooistra's findings based on a lack of objective findings [R. 35 (unsupported by clinical and laboratory diagnostic techniques)]. The ALJ also concluded that Dr. Kooistra's opinion was inconsistent with the remainder of the evidence, including other treating sources and Plaintiff's statements. [R. 35.] Upon review, however, the Court finds the ALJ's brief analysis of Dr. Kooistra's opinions ignores the medical evidence of record that supports her opinions and/or fails to explain how the other medical evidence of record squares with the ALJ's findings.

As stated above, under the "pain rule" applicable in the Fourth Circuit, "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir.1987) (*citing Hicks v. Heckler*, 756 F.2d

36

1022, 1023 (4th Cir.1985)).  Thus, by application of reason, it is possible that a treating physician could find physical limitations based on credible pain[5] complaints even in the absence of objective findings.  Thus, the fact that the ALJ did not find sufficient *objective* findings in Dr. Kooistra's treatment notes to support her findings regarding Plaintiff's physical limitations does not appear, in and of itself,  to be a proper basis for the rejection of her entire opinion (which, again, is contrary to Social Security regulations).

Additionally, with respect to other evidence of record, the Court notes that the ALJ failed to explain how his findings are consistent with evidence of record which appears to support Dr. Kooistra's opinion regarding Plaintiff's functional limitations.  For example, the ALJ failed to explain how he squared his findings with:

* treatment notes by Dr. Paul Behr indicating that Plaintiff failed medial branch block, radio frequency ablation and epidural steroid injections to treat pain;

* treatment notes by Dr. George S. Bailes indicating that Plaintiff has exhausted all conservative options and recommending a spinal cord stimulator for pain management;

* treatment notes by  Dr. David Mitchell indicating that Plaintiff continued to have intermittent radiculopathy going down in his right lower extremity approximately to his knee and that his pain was exacerbated with walking and prolonged sitting;

* treatment notes by Dr. Lawrence Warren interpreting the images of a full body scan and finding increased activity in the right shoulder, probably degenerative; increased activity about the right lateral knee which are degenerative or post traumatic; and increased activities projecting over the left lower chest; and,

---

[5]Upon review of the medical records in the file, there is no indication any physician treating Plaintiff found or suspected he was not being truthful regarding the nature or severity of his pain complaints.  Accordingly, for purposes of this discussion, the Court presumes Plaintiff's pain complaints are credible.

To the contrary, the ALJ appears to have selected certain portions of the extensive medical record in this case and ignored other portions without explanation or any obvious consideration. At the very least, the ALJ should have explained his consideration of the other medical evidence of record, particularly by physicians who treated Plaintiff for his pain complaints, and explained why their findings weighed in favor of or against the physical limitations imposed by Dr. Kooistra. Without further discussion of why Dr. Kooistra's opinions are inconsistent with the balance of the record, the Court cannot say that the ALJ's opinion is supported by substantial evidence. *See Arnold v. Sec'y of Health, Ed. & Welfare*, 567 F.2d 258, 259 (4th Cir.1977) ("Unless the ALJ has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record.").

**Plaintiff's Remaining Arguments**

Because the Court finds the ALJ failed to properly weigh the opinion evidence provided by Plaintiff's treating physician Dr. Kooistra, and this is a sufficient basis to remand the case to the Commissioner, the Court declines to specifically address Plaintiff's additional allegations of error by the ALJ. However, upon remand, the Commissioner should take into consideration Plaintiff's remaining allegations of error.

<u>**CONCLUSION AND RECOMMENDATION**</u>

Wherefore, based upon the foregoing, the Court recommends that the Commissioner's decision be REVERSED and the case be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative action consistent with this recommendation.

38

IT IS SO RECOMMENDED.


July 21, 2014                         Jacquelyn D. Austin
Greenville, South Carolina            United States Magistrate Judge